Filed 1/6/15  Marriage of Krog and Cobert CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re the Marriage of TIFFANY KROG and RON COBERT. | B246762 |
| | (Los Angeles County Super. Ct. No. LD051625) |
| TIFFANY KROG, Respondent, v. RON COBERT, Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael J. Convey, Judge.  Affirmed.

Linda N. Wisotsky for Appellant.

Tiffany Krog, in pro. per., for Respondent.

_____

Ron Cobert (Ron) appeals from a judgment entered after trial on the reserved issue of attorney fees in a marital dissolution proceeding with his former spouse, Tiffany Krog (Tiffany).[1]  In the judgment on reserved issues, the trial court ordered Ron to pay to Tiffany a total of $20,000 in attorney fees, consisting of $10,000 under Family Code sections 2030 and 2032 and $10,000 in sanctions under section 271.[2]  The trial court ordered Tiffany to pay a total of $12,500 in attorney fees to Ron, consisting of $5,000 under sections 2030 and 2032 and $7,500 in sanctions under section 271.[3]  The judgment resulted in a net award to Tiffany of $7,500.

Ron contends that the trial court erroneously awarded attorney fees against him for seeking discovery necessitated by Tiffany's concealment of assets, particularly real property, and sanctioned him for not settling and continuing to litigate the attorney fees issue when that continued litigation was the product of Tiffany's bad faith and not any on his part.

Because we conclude that the acrimonious and wasteful conduct of the parties and their counsel support the trial court's attorney fee and sanctions award, and that the trial court applied the appropriate statutory criteria, the trial court did not abuse its discretion in making the award at issue here.  We thus affirm.

## BACKGROUND

### I.  The Petition and Dissolution Judgment

After being in a nonmarital relationship for several years, Ron and Tiffany married on June 30, 2007.  The couple separated four months later, on October 31, 2007.  There were no children in the marriage.

---

[1] We refer to the parties by their first names for ease of reference and not out of disrespect.

[2] Undesignated statutory references are to the Family Code.

[3] Tiffany has not appealed this ruling.

2

On December 10, 2007, Tiffany, who is an attorney, filed her petition in propria persona for nullity of marriage on the ground of fraud (§ 2210, subd. (d)). Tiffany alleged there were no assets or debts subject to the court's disposition.

On June 10, 2008, Ron filed a response requesting dissolution of the marriage. Ron alleged that there may be community assets and debts that were unknown to him, and that he would amend his response if he ascertained that community assets or debts existed.

On October 28, 2009, the trial court entered a stipulated judgment of dissolution of marriage (status only), in which the parties agreed that Ron would prepare a further judgment on reserved issues except as to attorney fees, and submit it to the parties for their approval, and then to the trial court.[4] The trial court reserved jurisdiction over the "contested issue of attorney fees and costs." The judgment of dissolution also recited that the "parties each served their preliminary and final declarations of disclosure."

On November 13, 2009, the trial court entered a judgment ordering that there would be no spousal support, and that jurisdiction over that issue was terminated. The judgment recited that the "parties have complied with the requirement of service of a preliminary and final declaration of disclosure." The judgment identified and confirmed as his or her sole separate property various personalty and realty. Identified as Tiffany's separate property was, among other items, a residence purchased by Tiffany during the first quarter of 2009, and located on Loleta Avenue in Los Angeles, California (Loleta property). The judgment also confirmed ownership to Ron of, among other items, real property on Murietta Avenue in Sherman Oaks, California, which had been owned by Tiffany prior to the marriage, but for which she had executed a quitclaim deed during the proceedings. The further judgment again reserved jurisdiction over the contested issue of attorney fees and costs.

---

[4] Two different judges handled the pretrial and trial proceedings in this case. For ease of reference we use the term "trial court" to refer to both judges.

3

## II. Evidence in the Trial on Attorney Fees and Costs

### A. The Exhibits[5]

Trial on the reserved issue of attorney fees and costs occurred over six days between February and June 2012. Tiffany's evidence centered on her theory that Ron caused unnecessary litigation by refusing settlement offers and unduly prolonging the dissolution proceeding through overly aggressive litigation. Ron's theory was that Tiffany had unreasonably requested a "nullity" as a disposition and had been uncooperative in disclosing community assets, including the purchase of the Loleta property.

At trial, the parties introduced approximately 120 exhibits, most of which were correspondence between the parties. The correspondence bear witness to the acrimonious history of this case. We now recount highlights of that history below.

The initial correspondence was, in the words of the trial court, "*courteous and professional exchanges within the context of adversarial litigation.*" In a letter dated May 29, 2008, from Tiffany to Ron's attorney, Linda N. Wisotsky (Ms. Wisotsky), Tiffany discussed a quitclaim deed and requested that the matter be settled. On June 10, 2008, Ms. Wisotsky wrote a letter to Tiffany advising her that disclosures were required before a settlement could be reached. Tiffany responded on August 11, 2008, by stating the "dissolution proceeding has now lasted longer than the subject four month marriage."

The trial court observed that commencing with a September 30, 2008 letter from Tiffany's attorney, "*inappropriate invective*" started appearing in the parties' correspondence. In that letter, Tiffany's attorney, Robert Sainburg (Mr. Sainburg), sent a proposed judgment for nullity to Ms. Wisotsky and threatened to seek attorney fees for

---

[5] At trial, both sides submitted separate trial books without allocating exhibit numbers, resulting in the trial court's review of duplicate exhibits and each side's using the same exhibit numbers. Thus, the trial court had to designate exhibits bearing the same exhibit number with the proposing party's first name initial preceding the number of the exhibit. The trial court blamed Ron's attorney for failing to meet and confer, which would have enabled the parties to submit one set of exhibits in chronological order.

Ron's "charades and delays." On October 23, 2008, Mr. Sainburg sent a proposed judgment for dissolution. In his October 31, 2008 letter, Mr. Sainburg threatened that if he did not hear from Ms. Wisotsky, he would proceed with his nullity theory and to "prove up the repeated, violent, and injurious conduct by [Ron] against [Tiffany], and request that this marriage be deemed the sham that it was." The trial court described Tiffany's nullity theory as "*unnecessary and unreasonable*" and not a proper "*negotiating 'tool.'*"

Ms. Wisotsky sent letters to Mr. Sainburg on November 26, 2008, December 15, 2008, and January 20, 2009, rejecting the proposed October 2008 judgment because it failed to list assets to be confirmed to each party. Ms. Wisotsky sent Ron's proposed judgment to Mr. Sainburg on November 26, 2008. The cover letter questioned the completeness of Tiffany's disclosure of items taken from the family home.

On December 8, 2008, Mr. Sainburg sent a letter that stated in part: "There will be no more <u>disclosure nonsense</u> on this side. There will be a request for annulment, a deposition, possibly an Unruh Civil Rights action to the extent not barred by the applicable statute of limitations (which it might be), and if [Ron] continues to make harassing calls to [Tiffany's] aging parents, a civil harassment restraining order. [¶] If you cannot exercise client control, or if you are at fault for these charades, perhaps your client would be better served by an attorney who knows how to settle a case on a four month, no asset marriage."

By letter dated December 15, 2008, Mr. Sainburg rejected Ron's attorney's proposed judgment. The letter stated in part: "Due to your delays and antics, we are now forced to prepare this case for an annulment/dissolution trial. The case has been set for a trial setting conference, as well as the hearing on our motion to amend our client's petition. Upon receipt of our client's signed version of the judgment, we will forward to our client's signatures [*sic*] for you to go *ex parte* to the Court, if you wish, to have it entered by the end of the year." On January 26, 2009, at a hearing on Tiffany's motion to amend the petition, the trial court indicated that Tiffany appeared to be "playing games" in pursuing her nullity theory.

5

On March 13, 2009, Mr. Sainburg sent a letter to Ms. Wisotsky with a proposed judgment. The letter stated that it included all of Ms. Wisotsky's proposed changes. On March 17, 2009, Ms. Wisotsky rejected that proposed judgment due to pleading paper errors, unattached property inventories, and "warranties and clauses that are untrue." She described the judgment as "shabbily prepared."

In a March 31, 2009 letter, Ms. Wisotsky stated that settlement appeared impossible unless Ron signed Tiffany's proposed judgment, and re-sent interrogatories that Mr. Sainburg denied having received earlier. The trial court referred to this letter as "*re-engaging the litigation in an effort to gain the advantage of trying to get the other side to agree to their terms.*"

On April 15, 2009, Mr. Sainburg sent a letter to Ms. Wisotsky that enclosed Ron's version of a dissolution judgment signed by Tiffany and her counsel. This was subsequent to an April 3, 2009 letter from Mr. Sainburg to Ms. Wisotosky, in which Mr. Sainburg indicated his client's willingness to sign a settlement agreement "*in whatever form you request* so that we may sign and return [it] to your office for processing." The trial court observed that "*it would appear that as of this date, TIFFANY abandoned the legal theory of nullity in favor of dissolution.*" Although it was Ron's proposed judgment, Ron did not sign it.

By e-mail dated April 24, 2009, Tiffany advised Ron that Mr. Sainburg was no longer representing her and that Ron's attorney was not responding to her. Tiffany reminded Ron that she had signed his proposed judgment and recounted her efforts to settle the case and his complete lack of responsiveness. On April 28, 2009, Ms. Wisotsky referenced the interrogatories, threatened to seek attorney fees, and reminded Tiffany not to e-mail Ron.

In a June 19, 2009 letter, Tiffany attached her "further" responses to Ron's first set of interrogatories, in which she disclosed the address of the Loleta property and argued that no additional responses regarding her income were required. She again inquired into why Ron had not signed the very judgment he had proposed, and stated that in an effort to settle the case, she had quitclaimed the Murietta property to Ron, given him her

6

wedding band, and let him keep her dog. She repeated that she wanted to settle the case, called the litigation "frivolous," and recited, "**This FOUR MONTH marriage dissolution appears to be yet another case in the court system that is being churned by a patently unreasonable party.**" Significantly, the trial court observed that this "*should--at the very* [*least*]*--be the place where this litigation ended, as RON now had the required, supplemental information and full disclosure from TIFFANY . . . . A civil letter or two at this stage from Ms. Wisotosky, simply identifying the required court forms for a* [*j*]*udgment . . . would surely have ended the case in June 2009.*" But that was not to be.

The trial court reiterated this observation in describing a July 2, 2009 letter from Ms. Wisotsky to Tiffany, which the trial court described as Ms. Wisotsky's engaging Tiffany "*in a dialogue that only raises the 'temperature' of the parties.*" The trial court described Tiffany's July 2, 2009 letter to Ms.Wisotsky as "*needlessly personal and vitriolic,*" and "*not tolerable in civil, professional litigation, but it is too common in this litigation.*"

As previously noted, the trial court subsequently entered a stipulated judgment of dissolution of marriage as to status only on October 29, 2009, and a further judgment in November 2009, reserving the issue of attorney fees and costs.

### B. Tiffany's Declarations

On July 12, 2011, Tiffany filed a declaration in propria persona in which she requested attorney fees under section 271. Tiffany declared that four months into the marriage, she informed Ron that she would seek a dissolution of the marriage because of his ongoing verbal and physical abuse.

Tiffany tried to facilitate an expedient termination of the marriage by executing a quitclaim deed to the family home, giving Ron her wedding band, moving out of the residence with her personal property, and giving him a pet dog that she had owned for seven years prior to the marriage. Tiffany asserted in the declaration that Ron "intentionally frustrated settlement and increased litigation costs" by rejecting her four

7

"'walk away'" settlement offers, propounding duplicative discovery requests, and falsely accusing her of failing fully to respond to discovery requests and hiding assets.

Tiffany initially was self-represented. According to Tiffany, Ron chose to punish her for leaving him and "maliciously dragged out the dissolution of the four month marriage for over three years by hiring an aggressive, $400 an hour" attorney. In August 2008, Tiffany retained Robert Sainburg to represent her and assist her in resolving the matter. Mr. Sainburg charged Tiffany an hourly rate of $390. Tiffany declared that Ron and his attorney "continued to delay and obfuscate the dissolution." By April 2009, she had incurred $10,539.06 in attorney fees but could not afford additional fees, so she "substituted back in as a pro per." She further declared that she incurred attorney fees for 27.56 hours of Mr. Sainburg's time between August 2008 and April 2009. Tiffany attached copies of billing statements to her declaration, reflecting Mr. Sainburg's work from August 2008 through April 2009.

Mr. Sainburg filed a declaration on August 20, 2011, in which he stated that Tiffany re-engaged him in July 2009. By the time of the trial in August 2011, he had billed $13,145.73, of which of $12,818.81 had not yet been paid. When he initially received the case in August 2008, he determined that it was a domestic violence and annulment case because third party witnesses described repeated physical attacks on Tiffany by Ron, which led her to end the marriage after four months. This conduct included: violently throwing objects in the presence of Tiffany and her mother; shouting obscenities, demeaning words, and names to Tiffany; bashing doors; and maintaining guns, shotguns and knives.

Mr. Sainburg decided that the fastest way to end the proceeding was to file an amended petition for dissolution based only on irreconcilable differences. Because Ron's counsel, Ms. Wisotsky, would not stipulate to the amended petition, Tiffany had to file a motion to amend the petition.

Mr. Sainburg described the "'walk-away'" agreement he attempted to negotiate, including giving Ron Tiffany's home, dog, and wedding band. Mr. Sainburg declared that Tiffany "wanted nothing but to be free of what had now become clear to me to be an

8

obsessive and stalking personality and an attorney that was fueling, rather than diffusing, the matter."

Mr. Sainburg indicated that discovery had been conducted "*ad nauseum*" and that disclosures were made in order to get to the "'finish line.'" He declared that he repeatedly complied with "outrageous demands for supplemental discovery responses and disclosures." Ron's counsel continued to make baseless accusations against Mr. Sainburg and Tiffany. In his opinion, the divorce could have been completed without attorneys and needless attorney fees and costs, which were incurred over four years.

In a supplemental declaration filed on February 24, 2012, Mr. Sainburg attached billing statements showing 51.36 hours billed through February 24, 2012, and unpaid fees of $19,468.95. Mr. Sainburg opined that but for Ron and his attorney's conduct, the case would not have generated more than $2,000 in fees. By June 2012, Mr. Sainburg stated that Tiffany's unpaid fees were $25,146.33 and she had incurred a total of $30,482 in fees through June 8, 2012, of which she had paid only $5,355.67. He estimated that she would incur a total of $35,552 through the trial and requested that Ron pay $19,733.

### C. Ron's Declarations

On July 11, 2011, Ms. Wisotsky submitted a declaration and attached billing statements showing that she had charged Ron for 83.40 hours from December 27, 2007, through July 11, 2011, for a total of $30,397.50, of which Ron had paid only $4,000.

In a supplemental declaration filed on October 17, 2011, Ms. Wisotsky stated that the case should have been concluded in about 15 hours and Ron's fees should have been no more than $6,000. According to Ms. Wisotsky, the problem was with Tiffany and her attorney because they refused to cooperate with disclosure rules by fully and completely disclosing assets. This included disclosing inconsequential items and failing to disclose substantial items of property. Instead, they avoided Ms. Wisotsky's requests and were insulting in their correspondence.

Ms. Wisotsky further declared that initially Tiffany pursued a nullity theory based on fraud. When Ron would not agree to a nullity judgment, Tiffany's attorney sought the

9

court's intervention to establish a new ground for nullity under section 720 when the only applicable law was section 2210. Tiffany and her counsel also maintained that domestic violence could be a ground for nullity and threatened to have a trial on that issue. Ms. Wisotsky cited as an example the October 31, 2008 letter from Mr. Sainburg noted above in which he threatened to proceed with his request for nullity, to prove up Ron's repeated acts of violence, and to have the marriage deemed a sham. Ms. Wisotsky thought that Tiffany's nullity theory caused Ron to incur an additional $5,000 in attorney fees.

On November 26, 2008, Ms. Wisotsky sent a letter with a proposed judgment, which Mr. Sainburg rejected. Thereafter, the parties became embroiled in a discovery dispute about interrogatory responses, specifically about typographical errors and documents lost in the mail. Although Ms. Wisotsky admitted that Mr. Sainburg signed Ron's proposed judgment on April 14, 2009, Ms. Wisotsky then "insisted on the answers to the interrogatories" because she believed that "they were hiding something"; she wanted the time to do due diligence "and find out why all the game-playing."

After Mr. Sainburg substituted out of the case in April 2009, Ron discovered that Tiffany had begun purchasing a home in January 2009. Ms. Wisotsky pointed out that there were several opportunities to disclose the purchase during the proceedings. Tiffany did not disclose the Loleta property until June 2009.

### D. Trial Testimony

Tiffany testified that she was an attorney, but when she filed the petition, she had never practiced family law. She filed the nullity petition without benefit of counsel; she retracted the nullity request early in 2008.

Tiffany described Ron's acts of domestic violence before their marriage. His conduct included kicking down a door, threatening to throw a blender, threatening her with a knife, throwing her against a wall, and breaking a window by angrily tapping on it. Ron promised her that the conduct would cease after their marriage, but it did not stop. Tiffany could not understand why he did not want an annulment.

10

Tiffany testified that Ms. Wisotsky had conditioned settlement upon Tiffany's providing a disclosure of assets. Tiffany provided the requested disclosure to Ron's counsel in July 2008, but did not receive a settlement proposal or judgment. She submitted her final declaration of disclosure in September 2008. Tiffany purchased a home after serving the final declaration of disclosure. She did not use community funds or assets to purchase the property because there was no "community money." She was willing to end the marriage by dissolution in October 2008 and was no longer seeking a nullity.

The trial court noted that Tiffany's demeanor during the trial was angry and "'short'" with opposing counsel, and reflective of trying to deflect responsibility for the length and expense of litigation entirely to RON, without recognizing her conduct as a contributing factor." She "often acted out in an unprofessional manner in court." The court had to admonish her when she started to walk out of the courtroom. The court observed that these actions "reflected poorly" on her credibility and that the court had weighed her declarations and testimony "in this light." In contrast, the trial court found Tiffany's testimony about Ron's domestic violence to be "persuasive." In balance, however, her credibility was "adversely affected by her behavior in court, even when the evidence (especially on alleged domestic violence and RON's protracted refusal to close out this case after April 2009) was in her favor."

Ron testified that he worked in the entertainment industry as a producer, writer, editor, and director of photography. Ron was surprised when Tiffany initially indicated she wanted to nullify the marriage on the ground of fraud in 2007. She first proposed dissolution of marriage only in October 2008. Ron denied committing any acts of domestic violence; according to Ron, Tiffany was the aggressive one. The trial court found that Ron was "too quick to blame everything on Tiffany." The trial court found his "affect . . . calm and measured, but too contrived in the Court's assessment." The trial court also found Ron "to be poor in credibility and his testimony and declarations were weighed accordingly."

11

Ms. Wisotsky testified that in 2007 she received a call from Ron informing her that Tiffany was moving things out of their home before he had a chance to inventory the personal property, and that when she asked Tiffany to wait until he had a chance to do so, Tiffany refused. She then recounted a conversation with Mr. Sainburg in March 2008, in which Mr. Sainburg asked about how to move the case along, to which Ms. Wisotsky suggested that Tiffany prepare a list of property that she had taken. Ms. Wisotsky then described a mailing mishap regarding interrogatories she had propounded to Tiffany. She testified that Tiffany had the mistaken belief that Tiffany did not have to disclose real estate she had purchased after submitting her final disclosure. This "'hiding the ball'" coupled with advocating an unfounded nullity theory caused unnecessary delay. She called Tiffany's disclosure in July 2008 "completely inadequate" and explained that she "was fought tooth and nail." The court found her credible and on balance, "persuasive," although she "veered slightly toward showing inappropriate embroilment in this case."

## III. The Trial Court's Ruling and Judgment

The trial court issued a 37-page "Final Statement of Decision" on the reserved issue of attorney fees and costs. The trial court found that sanctions were warranted against both sides because Ron, Tiffany, and their attorneys had engaged in "bad faith and delaying conduct."

In ordering Tiffany to pay a total of $12,500 in attorney fees to Ron, the trial court found that Tiffany had engaged in two outbursts in court despite being a litigation attorney: one during the trial and one at a pretrial hearing in June 2009. Tiffany pursued a nullity theory after it was clear that theory was not supported by fact or law. Tiffany's attorney used the nullity theory as a "'veiled threat'" in exchange for an agreement to settle the case as a dissolution matter.

Although Tiffany and her counsel had provided the required final disclosure forms by June 2009, Tiffany and her counsel continued to argue the point. Tiffany "unreasonably" insisted that items of property and other "'salacious details'" about the parties' private matters be kept out of the public record. The trial court determined that Tiffany and her attorney "used aggressive, disrespectful and unnecessarily forceful

12

language in correspondence" on several occasions even after they relented on the nullity theory.

The trial court ordered Tiffany to pay Ron $5,000 in fees incurred prior to April 2009 — when she abandoned her nullity theory — as a contributive share of his attorney fees and costs pursuant to sections 2030 and 2032. The trial court concluded that Ron would not have had to incur $5,000 in attorney fees prior to April 2009 if Tiffany had not maintained her nullity theory. The trial court further ordered Tiffany to pay Ron $7,500 for monetary sanctions pursuant to section 271 because her conduct prior to April 2009 "was unreasonable, in bad faith and caused this case to fail to settle early" and would not impose "an unreasonable burden on her."

The trial court determined that Ron's attorney had engaged in bad faith and dilatory conduct by using "aggressive, disrespectful and unnecessarily forceful language in correspondence" to Tiffany and her attorney. Even after Tiffany abandoned her "unreasonable" nullity theory, Ron's attorney continued an aggressive tone and approach throughout the proceedings, refused a "reasonable, cost-saving offer to settle this case on a 'walkway' basis" over a year earlier, and instead demanded $15,000 to settle the matter without explanation or justification. The trial court further determined that Ron's attorney more so than Tiffany's attorney "acted unreasonably and in bad faith" and took an "aggressive, non-responsive and uncooperative approach . . . from start to finish in this case."

The trial court determined that Ron's attorney increased litigation costs by failing to engage in a meaningful meet and confer to resolve evidentiary issues, for example, as to the exhibit notebooks referred to in footnote 5, *ante*. The trial court found that "Ron engaged in unnecessary, time-consuming discovery" with Tiffany after her attorney substituted out of the case, which had "no usable purpose" at the trial on reserved issues. This was because "once the updated, completed disclosures were received in September 2008, there did not need to be any more discovery conducted."

The trial court then concluded that the matter could and should have ended in April 2009 at the latest, but more reasonably should have ended in October or November

13

2008. The trial court reasoned that Ron "worked this case as if he had vastly superior financial resources" to Tiffany's means. The trial court concluded that neither Ron nor Tiffany had the financial wherewithal to litigate the matter, which consumed over four years of court time and almost $90,000 in total fees for a marriage that lasted only four months. The court noted that the parties had no significant community assets or debts, no children, and no spousal support obligations. Instead, Ron's "relentless conduct, more so than Tiffany's relentless conduct, served more to anger and to frustrate Tiffany, and to aggravate Tiffany and her attorney, causing fees and costs to be spent needlessly." (Capitalization omitted.)

The trial court found that, after April 2009, Ron incurred $39,475 in fees and costs, and Tiffany incurred $19,080.55 in fees. The trial court ordered Ron to pay a total of $10,000 in attorney fees to Tiffany for a contributive share of post-April 2009 attorney fees and costs pursuant to sections 2030 and 2031.

When the trial court ordered Ron to pay Tiffany $10,000 in sanctions for post-April 2009 conduct pursuant to section 271, it concluded that his conduct in the protracted litigation and his settlement position after the main issue of nullity was resolved was in bad faith, prevented settlement, and increased the cost of litigation. The court acknowledged that the fee award and sanction might cause Ron financial hardship or adversely affect his finances. The trial court gave consideration to the fact that, "'on paper,'" Ron appeared to have an inferior ability compared to Tiffany to pay need-based fees. The trial court observed that Ron "may need to further encumber or sell his house or other assets to pay his share of legal expenses and the sanctions in the case." As a countervailing consideration, the trial court found that Ron had relied on Tiffany's superior finances unreasonably to drag out the case after Tiffany assumed a more reasonable litigation and settlement posture.

After rejecting Ron's objections to the final statement of decision, the trial court entered judgment on the reserved issue and ordered Ron to pay Tiffany a net award of $7,500. Ron filed a timely notice of appeal from the judgment.

14

**DISCUSSION**

**I. Applicable statutes regarding attorney fees and sanctions**

As previously noted, the trial court ordered both parties to pay attorney fees under sections 2030 and 2032 and sanctions under section 271.

Section 2030 provides in pertinent part: "(a)(1) In a proceeding for dissolution of marriage, nullity of marriage, or legal separation of the parties, and in any proceeding subsequent to entry of a related judgment, the court shall ensure that each party has access to legal representation, including access early in the proceedings, to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party, except a governmental entity, to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding. [¶] (2) When a request for attorney's fees and costs is made, the court shall make findings on whether an award of attorney's fees and costs under this section is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties. If the findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs. A party who lacks the financial ability to hire an attorney may request, as an in pro per litigant, that the court order the other party, if that other party has the financial ability, to pay a reasonable amount to allow the unrepresented party to retain an attorney in a timely manner before proceedings in the matter go forward. . . ."

Section 2032 sets forth the criteria for an attorney fee award: "(a) The court may make an award of attorney's fees and costs under Section 2030 or 2031 where the making of the award, and the amount of the award, are just and reasonable under the relative circumstances of the respective parties. [¶] (b) In determining what is just and reasonable under the relative circumstances, the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in Section 4320.

15

The fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested. Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances. . . ."

Section 271 permits a trial court to impose sanctions against parties who frustrate the purposes of settlement and reduction of litigation costs. Section 271 provides in pertinent part: "(a) Notwithstanding any other provision of this code, the court may base an award of attorney's fees and costs on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys. An award of attorney's fees and costs pursuant to this section is in the nature of a sanction. In making an award pursuant to this section, the court shall take into consideration all evidence concerning the parties' incomes, assets, and liabilities. The court shall not impose a sanction pursuant to this section that imposes an unreasonable financial burden on the party against whom the sanction is imposed. In order to obtain an award under this section, the party requesting an award of attorney's fees and costs is not required to demonstrate any financial need for the award. . . ."

## II. The appropriate standard of review is the abuse of discretion standard and not de novo review

Ron asserts that the trial court's determinations are subject to de novo review because the trial court erred in refusing to apply section 2100 to Tiffany's conduct for intentionally withholding disclosure of the Loleta Avenue property, which she purchased after serving her final declaration of disclosure. Ron also asserts that the trial court then improperly sanctioned him pursuant to sections 2030, 2032, and 271 for conducting discovery even though it resulted in Tiffany's disclosure of that property while the matter was in litigation. We disagree with both assertions.

16

The applicable standard of review for an award of attorney fees and costs under sections 2030 and 2032 is abuse of discretion, and not de novo. Attorney fees are awarded in a marital dissolution proceeding to provide a party with adequate funds properly to litigate the proceeding. (*In re Marriage of Sullivan* (1984) 37 Cal.3d 762, 768.) In making that determination, the trial court considers the respective needs and incomes of the parties, but is not restricted to salary alone and may consider all the evidence including assets and liabilities. (*Ibid*.) "[A] motion for attorney fees and costs in a dissolution proceeding is left to the sound discretion of the trial court. [Citations.] In the absence of a clear showing of abuse, its determination will not be disturbed on appeal. [Citations.] '[T]he trial court's order will be overturned only if, considering all the evidence viewed most favorably in support of its order, no judge could reasonably make the order made. [Citations.]' [Citation.]" (*Id.* at pp. 768–769; see also *In re Marriage of Bendetti* (2013) 214 Cal.App.4th 863, 868–869; *In re Marriage of Cryer* (2011) 198 Cal.App.4th 1039, 1054–1055.)

Similarly, abuse of discretion is the standard of review for an award of a section 271 sanction. "We review an award of attorney fees and costs under section 271 for abuse of discretion. [Citation.] 'Accordingly, we will overturn such an order only if, considering all of the evidence viewed most favorably in its support and indulging all reasonable inferences in its favor, no judge could reasonably make the order. [Citations.]' We review any factual findings made in connection with the award under the substantial evidence standard. [Citation.]" (*In re Marriage of Fong* (2011) 193 Cal.App.4th 278, 291.)

Ron argues that the trial court did not properly consider section 2100**6** in awarding the fees and costs under sections 2030 and 2032 and in awarding sanctions. The record

**6** Section 2100 provides: "The Legislature finds and declares the following: [¶] (a) It is the policy of the State of California (1) to marshal, preserve, and protect community and quasi-community assets and liabilities that exist at the date of separation so as to avoid dissipation of the community estate before distribution, (2) to ensure fair and sufficient child and spousal support awards, and (3) to achieve a division of community and quasi-community assets and liabilities on the dissolution or nullity of

17

reveals that the trial court did engage in the evaluation required by section 2100. As illustrative only of that evaluation, the trial court observed that Tiffany had initially been less than forthcoming in her disclosure as to the Loleta property, but faulted Ron regarding his "relentless" pursuit of discovery as to the Loleta property for many months even after the existence of that property had been fully disclosed. "Ron engaged in unnecessary, time-consuming discovery" with Tiffany after her attorney substituted out of the case, which had "no usable purpose" at the trial on reserved issues. This was because "once the updated, completed disclosures were received in September 2008, there did not need to be any more discovery conducted."

The trial court then concluded that the matter could and should have ended in April 2009 at the latest, but more reasonably in October or November 2008. The trial court determined that neither Ron nor Tiffany had financial resources to litigate the matter, which consumed over four years of court time and almost $90,000 in total fees, for a marriage that lasted only four months. The court noted that the parties had no significant community assets or debts, children, or spousal support obligations, and that Ron's "relentless conduct" generated needless attorney fees and costs more than did Tiffany's "relentless conduct."

Under the applicable standards of review, we cannot conclude that the trial court abused its discretion in awarding the attorney fees under sections 2030 and 2031. The

marriage or legal separation of the parties as provided under California law. [¶] (b) Sound public policy further favors the reduction of the adversarial nature of marital dissolution and the attendant costs by fostering full disclosure and cooperative discovery. [¶] (c) In order to promote this public policy, a full and accurate disclosure of all assets and liabilities in which one or both parties have or may have an interest must be made in the early stages of a proceeding for dissolution of marriage or legal separation of the parties, regardless of the characterization as community or separate, together with a disclosure of all income and expenses of the parties. Moreover, each party has a continuing duty to immediately, fully, and accurately update and augment that disclosure to the extent there have been any material changes so that at the time the parties enter into an agreement for the resolution of any of these issues, or at the time of trial on these issues, each party will have a full and complete knowledge of the relevant underlying facts."

record reveals that after a six-day trial with numerous exhibits, declarations, and testimony from the parties and counsel, the trial court issued a voluminous opinion, which exhaustively documented the protracted litigation history. The trial court concluded that the award of attorney fees was warranted because the parties' unprofessional, uncivil, and aggressive conduct generated fees far out of proportion to the four-month marriage that was before the court, especially when there were no community assets, children, or spousal support. There was no abuse of discretion regarding the attorney fee award under sections 2030 and 2032. Likewise, Ron has not demonstrated that the trial court abused its discretion in sanctioning him under section 271. (*In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1225 [trial court may award attorney fees and costs as a sanction under section 271 when the parties fail to cooperate or frustrate settlement efforts, which lack of cooperation results in increased litigation costs].)

Ron claims he should not have been sanctioned because he refused to walk away from his day in court. In determining the attorney fee issue against Ron, the trial court found that Ron and his attorney had engaged in bad faith and dilatory conduct by using "aggressive, disrespectful and unnecessarily forceful language in correspondence" to Tiffany and her attorney. The award covered post-April 2009 conduct, including continuing to take an aggressive tone after Tiffany abandoned the nullity theory, refusing to settle the case on a "walkway" basis over a year before the trial, and refusing to sign his own proposed judgment in April 2009. The court also found that Tiffany disclosed the Loleta property in June 2009. The record simply does not support Ron's theory that he was sanctioned for exercising his right to have a trial on the reserved issue of attorney fees. Rather, the record supports the sanction award because of his bad faith conduct.

### III. The trial court did not award fees to Tiffany while she was self-represented

There is no merit to Ron's claim that de novo review is required because the trial court awarded Tiffany fees for self-representation. There is nothing in the record to suggest that the trial court awarded fees to Tiffany for the time she represented herself in

19

this litigation. Instead, Mr. Sainburg filed two declarations with billing statements showing the amount of fees that Tiffany was charged by his firm.

**IV. The trial court properly evaluated the applicable statutory factors as to the fee amounts**

Ron also incorrectly claims that the trial court did not properly evaluate the factors under sections 2030 and 2032 as to the amount of the fees awarded. The trial court considered: whether an award was appropriate based on the statutory factors (finding Ron was living above his means and his post-April 2009 conduct needlessly prolonged the litigation relative to Tiffany's conduct); whether there was a disparity in access to funds to retain counsel (noting that, on paper, Tiffany had greater assets but that Ron "was somehow paying a mortgage of almost $4,300—about 2/3 of his income" and after Tiffany dropped the nullity theory, he continued to litigate the matter "as if the stakes were high"); whether one party was able to pay for legal representation of both parties (finding Tiffany had greater resources but that she could not pay for both sides); and considering the circumstances of the respective parties described in section 4320, the hardships favored Tiffany (considering the short term marriage, no dependent children, income, assets and debts, the parties' claims of domestic violence and abusive behavior, and Tiffany's reasonable litigation posture after April 2009). We conclude that the trial court well considered the statutory factors in determining the amount of the attorney fee award.

In sum, the trial court was thorough and gave thoughtful consideration to the evidence and the law. We conclude that the trial court did not abuse its discretion in making the award of attorney fees and sanctions in this case.

20

## DISPOSITION

The judgment on the reserved issue of attorney fees and costs is affirmed.  Tiffany Krog is awarded her costs on appeal.

NOT TO BE PUBLISHED.


                                        BENDIX, J.*

We concur:


ROTHSCHILD, P. J.


JOHNSON, J.

---

*Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.